UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

CENTER FOR BIOLOGICAL DIVERSITY,

        Plaintiff,

   v.

U.S. BUREAU OF RECLAMATION,

        Defendant,

   and

ARNOLD IRRIGATION DISTRICT, et al.,

        Intervenor-defendants.

Case Nos. 6:15-cv-02358-JR
(Lead Case)
6:16-cv-00035-JR
(Trailing Case)

---

WATERWATCH OF OREGON,

        Plaintiff,

   v.

U.S. BUREAU OF RECLAMATION, et al.,

        Defendants,

   and

ARONOLD IRRIGATION DISTRICT, et al,

        Intervenor-defendants.

---

1    - OPINION AND ORDER

AIKEN, Judge:

In these consolidated actions, plaintiffs filed suit against the U.S. Bureau of Reclamation (BOR) and several irrigation districts (Districts), alleging that the BOR and Districts' operation and maintenance of Crane Prairie Dam and Reservoir, Wickiup Dam and Reservoir, and Crescent Lake Dam violate Sections 7 and 9 of the Endangered Species Act (ESA). Plaintiffs maintain that the dams' operations cause adverse impacts to the Oregon spotted frog, a threatened species, by inhibiting and altering natural flows of the Upper Deschutes River.

Plaintiffs now move for preliminary injunctive relief in order to protect the spotted frog pending final resolution in this case. Specifically, plaintiffs seek a preliminary injunction requiring BOR and the Districts to open the controls of the dams to allow for natural water flows, or, alternatively, to alter reservoir operations so that the flow of the Upper Deschutes River is maintained at levels of at least 770 cubic feet per second (cfs). BOR and the Districts oppose the motion and argue that plaintiffs' proposed relief will not aid and could harm the spotted frog while causing unanticipated effects and certain harm to other water users and stakeholders. The Confederated Tribes of the Warm Springs Reservation (the Tribe), as amicus curiae, also opposes plaintiffs' requested relief and argues that such relief likely would impair its interests in protected fish species.

On March 22, 2016, the court heard oral argument from the parties and the Tribe. As advised during the hearing, plaintiffs' motion is denied.

## DISCUSSION

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In order to obtain a preliminary injunction, the movant must show: 1)

2  - OPINION AND ORDER

a likelihood of success on the merits; 2) a likelihood of irreparable harm if the injunction is not issued; 3) the balance of hardships tips in the movant's favor, and 4) an injunction serves the public interest. *Id.* at 20; *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Here, plaintiffs' burden is more demanding because they seek a mandatory injunction requiring the BOR and Districts to take action; they do not seek a prohibitory injunction enjoining a proposed action. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 879 (9th Cir. 2009) (describing prohibitory and mandatory injunctions). Mandatory injunctions go "well beyond simply maintaining the status quo" and, as a result, are "particularly disfavored." *Id.* (citation omitted); *Stanley v. Univ. S. Cal.,* 13 F.3d 1313, 1320 (9th Cir. 1994). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases." *Marlyn Nutraceuticals,* 571 F.3d at 879 (internal quotation marks and citation omitted); *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust,* 636 F.3d 1150, 1160 (9th Cir. 2011) (accord). Consequently, plaintiffs must "establish that the law and facts *clearly favor"* their position. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Plaintiffs fail to meet this burden.

Plaintiffs allege that BOR has violated Section 7(a)(2) of the ESA by allowing the dams' continued operations before completing ESA consultation. Under Section 7, federal agencies must insure that any actions are not likely to jeopardize the "continued existence" of a threatened or endangered species or adversely modify the species' critical habitat. 16 U.S.C. § 1536(a)(2). Federal agencies must consult with the United States Fish and Wildlife Service (FWS) or National Marine Fisheries Service regarding any agency action that may affect a threatened or endangered species. *Id.*; *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 422 F.3d at 782, 790 (9th Cir. 2005).

3   - OPINION AND ORDER

Here, BOR has initiated consultation with the FWS on the effects of conservation measures the Districts intend to implement to benefit the spotted frog.[1] Plaintiffs nonetheless argue that the ESA consultation is too narrow and does not address the entirety of the dams' operations and resulting effects on the frog. Regardless of how the consultation process is characterized, BOR has initiated consultation regarding the dams' operations, and, presumably, the consultation will consider the cumulative effects of the dams' operations on the frog. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1045 (9th Cir. 2015) (remarking that "interrelated actions are, by definition, part of the 'effects of the action'"); *id.* at 1047 n.13 ("FWS is required in its biological opinion to determine 'whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species.' 50 C.F.R. § 402.14") (citation omitted). If the scope of consultation is too narrow, the court can address that factor at the merits stage; it does not warrant a preliminary injunction.

---

[1] In 2008, the Deschutes Basin Board of Control and the City of Prineville began developing the Deschutes Basin Habitat Conservation Plan (Deschutes HCP). Moran Decl. ¶¶ 11-13; Deflitch Decl. ¶ 44; Willey Decl. ¶¶ 10-16; *see also* 16 U.S.C. § 1539(a)(2)(A) (party seeking incidental take permit must submit a conservation plan). The Deschutes HCP process represents a multi-year, collaborative effort by numerous state, federal, tribal, non-governmental, and private entities to "help coordinate water management, streamflow restoration, and the long-term needs of sensitive and federally-listed species," including the spotted frog. Deflitch Decl. ¶ 44; Moran Decl. ¶¶ 11-13. The "Oregon Spotted Frog Technical Group" - comprised of scientists and experts from FWS, the United States Forest Service, the Oregon Department of Fish and Wildlife, the Oregon Water Resources Department, and the Districts - has developed conservation measures intended to enhance spotted frog habitat. Vaughn Decl. ¶¶ 19-21; Willey Decl. ¶¶ 17-18, 46-58. First Sewell Decl. Ex. 19. BOR initiated consultation with FWS in 2015, as some of these early conservation actions may require BOR approval or other affirmative agency action. The consultation is expected to be completed in July 2017 and will govern the Districts' operations pending completion of the Deschutes HCP, which is expected to occur in 2019. Moran Decl. ¶¶ 13-14 & Figs. 1-2. In the meantime, the Districts intend to implement interim measures to protect the spotted frog until the ESA consultation is complete. Vaughn Decl. ¶¶ 18-20, 28 & Ex. C; Moran Decl. ¶¶ 8, 28; Willey Decl. ¶¶ 46-58, 61; Diller Decl. ¶ 28; Britton Decl. ¶¶ 10-11.

4    - OPINION AND ORDER

Plaintiffs next claim that BOR has violated Section 7(d), which precludes an agency from making "any irreversible or irretrievable commitment of resources" after the initiation of consultation that would foreclose "any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). Plaintiffs apparently consider the continued operation of the dams as an "irretrievable" commitment of water resources. However, plaintiffs fail to explain how the continued operation of the dams will foreclose the implementation of any reasonable and prudent measures that may be developed during the consultation process. *See* Eitel Decl. U.S. Ex. F at 1-2 (Decision Memo by BOR asserting that the Districts' continued operations "will not irreversibly or irretrievably commit resources that have the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives").

Lastly, plaintiffs allege that BOR and the Districts are violating Section 9 of the ESA. To show a violation of Section 9, plaintiffs must demonstrate that the defendants' actions cause "take" of the spotted frog. 16 U.S.C. §§ 1538(a)(1)(B) (prohibiting "take" of protected species), 1540(a)(1) (imposing civil liability against those who violate ESA). The "take" of a protected species includes "harm" to the species, defined as "an act which actually kills or injures wildlife" or "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 16 U.S.C. § 1532(19); 50 C.F.R. § 17.3.

The parties disagree as to whether the Districts' ongoing operations, in light of the interim measures, will cause harm to the spotted frog. Plaintiffs argue that the dams' operations harm the frog "by causing desiccation of egg masses that kills the eggs, flooding of egg masses into deeper water that increases predation of eggs, and failure to inundate breeding habitat for much of the breeding season that either prevents or delays breeding." Pls.' Mem. in Support at

23; First Simpson Decl. ¶¶ 33-75. Plaintiffs thus contend that the spotted frogs in the Upper Deschutes River basin are likely to have "increased mortality" as a result. First Simpson Decl. ¶¶ 82-89. The Districts counter that plaintiffs' contentions are "highly speculative" and that "high mortality" rates are part of the "natural" life cycle for the frog. Districts' Opp'n at 34; Diller Decl. ¶¶ 31, 32. The Districts maintain that "it is often difficult to determine whether harm to an individual Oregon spotted frog, tadpole, or egg mass is likely the result of natural phenomenon or the direct result of some other action (e.g. operation of reservoirs to change water flows)." Districts' Opp'n at 34; Diller Decl. ¶¶ 31, 37; 79 Fed. Reg. at 51659-60 ("spotted frogs' eggs are extremely vulnerable to desiccation and freezing" due to the frogs' "laying habits").

As plaintiffs point out, the FWS listing decision for the spotted frog and other evidence reflect that regulated water releases from the dams affect overwintering and breeding habitat for the spotted frog. First Sewell Decl. Exs. 1, 4, 6, 7-9, 12; 79 Fed. Reg. at 51670. However, even if I found that the dams' operations were likely to result in unlawful "take" of the spotted frog in violation of Section 9, plaintiffs do not meet their burden of establishing that the facts and law clearly support the extraordinary injunctive relief they seek.

BOR and the Districts emphasize that the ESA protects species rather than individual animals, and, consequently, plaintiffs must show irreparable harm in the form of "significant population-level effects to the species." Fed. Def.'s Opp'n at 13; Districts' Opp'n at 13-15[2]; *see also Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1315 (D. Or. 2011) (finding that "irreparable harm to ESA listed species must be measured at the *species*

---

[2] Defendants maintain that plaintiffs must show the dams' operations are likely to cause irreparable harm to their own interests, which can be shown only through harm to the spotted frog as a species. *See Winter*, 555 U.S. at 20 (explaining that a party seeking injunctive relief must show that "he is likely to suffer irreparable harm"); *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004) (stating that "individual animals do not have statutory standing to sue" under the ESA).

6   - OPINION AND ORDER

level," and a "plaintiff must present a 'concrete showing of probable deaths during the interim period and of how these deaths may impact the species.'") (citation omitted); *Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209 (D. Mont. 2009) (explaining that considering harm to individual animals as irreparable harm "would produce an irrational result" because "the ESA permits incidental takes of a listed species"); *Ctr. for Envtl. Sci., Accuracy & Reliability v. Cowin*, 2015 WL 3797693, at *9 (E.D. Cal. June 18, 2015) ("Irreparable injury requires harm 'significant' to the 'overall population.'") (citation omitted).

Plaintiffs disagree and argue that the likelihood of a Section 9 violation establishes irreparable harm under the ESA. *See Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994). If plaintiffs were seeking a prohibitory injunction, I might agree that plaintiffs need not show irreparable harm at the species level, depending on the circumstances. Here, however, plaintiffs seek a mandatory injunction requiring wholesale changes to the operations of three dams and to the management of the Upper Deschutes River basin. Given these circumstances, plaintiffs must show more than a likely Section 9 violation to obtain such far-reaching relief. *Id.* ("Federal courts are not obligated to grant an injunction for every violation of the law."). Rather, to persuade this court to impose the mandatory injunction they seek, plaintiffs must make a showing of "extreme damage" and present evidence that the dams' operations are causing irreparable harm to the spotted frog that "would be significant for the species as a whole." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1210 n.2 (E.D. Cal. 2008); *Nw. Envtl. Def. Ctr*, 817 F. Supp. 2d at 1315. Plaintiffs fail to do so.

According to defendants, the Upper Deschutes River basin, including the area directly affected by the irrigation projects, continues to be a "stronghold" for the Oregon spotted frog. Fed. Defs.' Opp'n at 14. Defendants maintain that evidence shows the frogs are increasing in

7   - OPINION AND ORDER

some areas, stable at others, and declining in an area unaffected by dam and reservoir operations. 79 Fed. Reg. at 51666; Vaughn Decl. ¶¶ 10, 23; Diller Decl. ¶¶ 26-27, 29. Defendants also emphasize that current conditions in the Upper Deschutes basin actually benefit the frog. Vaughn Decl. ¶¶ 14-15, 29; Diller Decl. ¶¶ 11, 39-40; Moran ¶¶ 19, 33. Most significantly, the Districts are implementing interim measures - coordinated with and approved by FWS - to improve spotted frog habitat conditions during the ESA consultation process. *See* Moran Decl. ¶¶ 8, 28; Vaughn Decl. ¶¶ 20-21, 28; Willey Decl. ¶¶ 46-58, 61; Diller Decl. ¶ 28; Britton Decl. ¶¶ 10-11.

At oral argument, plaintiffs acknowledged the benefit of the interim measures but argued that low river flows in the winter will nonetheless cause imminent and irreparable harm to the spotted frog. *See* First Simpson Decl. ¶ 45 ("Low river flows during the reservoir refill season from mid-October to mid-April drop water tables to extremely low levels in riverine wetland habitat, eliminating or severely limiting suitable OSF overwinter habitat between Wickiup and Bend."); *id.* ¶¶ 96-101. However, I agree with defendants that plaintiffs allege potential adverse effects to the frog and its critical habitat without providing any substantive evidence to quantify the harm that would result. Without such quantified information, the court cannot find that the potential harm warrants the mandatory relief requested by plaintiffs. *See S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 2013 WL 4094777, at *7-8 (E.D. Cal. Aug. 13, 2013).

Even if plaintiffs established a likelihood of success on their ESA claims and some degree of irreparable harm to the frogs, plaintiffs fail to show that the balance of hardships tips in their favor and serves the public interest. Generally, the balance of hardships and the public interest tip "sharply" in favor of protected species. *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996). Nonetheless, a plaintiff seeking a preliminary injunction has the burden to "present the court with some basis on which it can conclude that an injunction would in fact

8   - OPINION AND ORDER

benefit the protected species." *All. for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1267 (D. Mont. 2014). Here, the record does not clearly support the finding that plaintiffs requested relief would significantly improve conditions for the spotted frog.

Plaintiffs present two options for injunctive relief. The "regulated" option would hold Crane Prairie reservoir at 4,443.3 feet and provide flows of 770 cfs below Wickiup dam. The "run of the river" option would open the controls of the of the Crane Prairie and Wickiup dams to "allow for natural flows to pass through the system and down the river." Pls.' Mem. in Support at 33. Plaintiffs also propose a minimum flow of 40 cfs for Crescent Creek/Little Deschutes. Plaintiffs' biological expert, Ms. Simpson, opines that such flows and reservoir levels are necessary to improve habitat conditions for the frog. First Simpson Decl. ¶¶ 90-92.

Initially, I note that plaintiffs' requested relief is not based on studies or surveys of the frog and the hydrological conditions of the Upper Deschutes River basin over a meaningful period of time. Rather, plaintiffs' proposals are based *primarily* on the limited observations of one individual over the course of several weeks. First Simpson Decl. ¶ 18. This fact alone renders the requested relief questionable. Moreover, biologists and other experts disagree with plaintiffs' proposals. *See* Declarations of Moran, Ramey, Vaughn, Diller. These experts note that certain conditions are beneficial to the frog and abrupt alterations could negatively affect those conditions and actually harm the frog. Diller Decl. ¶¶ 15-16, 20-22; Vaughn Decl. ¶¶ 11, 14-15, 17; Ramey Decl. ¶¶ 24-29; Moran Decl. Significantly, plaintiffs' experts do not acknowledge other impacts that could result from changes in management of the Upper Deschutes River basin, while defendants' experts contend that plaintiffs' injunction would not produce the hydrological results plaintiffs intend. Moran Decl. ¶¶ 9-10, 17-19, 28-31; Diller ¶¶ 24-25; Ramey Decl. ¶¶ 7, 18, 20-23, 26; Vaughn Decl. ¶¶ 12, 16, 26-29, 32; Willey Decl. ¶¶ 60, 62, 64.

9   - OPINION AND ORDER

It is not the court's role to pick and choose among expert opinions; a "federal court lacks the expertise and/or background in [frog] biology, hydrology, hydraulic engineering, water project operations, and related scientific and technical disciplines that are essential to determining how the water projects should be operated on a real time, day-to-day basis." *Gutierrez*, 606 F. Supp. 2d at 1214; *see also The Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (en banc) (explaining that the court should not "act as a panel of scientists" that "chooses among scientific studies"), *overruled on other grounds*, *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). Given the genuine dispute among relevant experts as to whether plaintiffs' proposal will remedy the harm allegedly caused by the dams' operations, plaintiffs fail to show that the requested relief will, in fact, benefit the spotted frog pending resolution of this case. *See S. Yuba River Citizens League*, 2013 WL 4094777, at *8.

Furthermore, I agree with defendants that plaintiffs' proposed relief would disrupt the ongoing, collaborative efforts by BOR, the Districts, the State of Oregon, the Tribe and other stakeholders to address long-term changes to the dams' operations. Vaughn ¶ 30; Moran Decl. ¶¶ 11-14; Willey Decl. ¶¶ 14-16, 46-58, 61. Such disruption would not assist the spotted frog in the long term or benefit the public interest.

Finally, the requested relief would create certain hardship for farmers and ranchers, increase the flood risk for the City of Tumalo, eliminate the use of stored water for at least one irrigation district, and potentially conflict with state water law. Macy Decl.; Johnson Decl. ¶¶ 44-45; Ramey Decl. ¶ 27; Horrell Decl. ¶ 14; Britton Decl. ¶ 20; Or. Rev. Stat. § 537.130(1) (impoundment of water must be authorized by the Oregon Water Resources Department). Plaintiffs' injunction also could affect other threatened species, such as the Columbia River bull

trout and the Middle Columbia River steelhead. As the Tribe points out, "the needs of the Oregon spotted frog cannot be considered in a vacuum." Tribe's Amicus Response at 15.

In short, plaintiffs' requested relief essentially would interfere with a collaborative process among relevant public and private stakeholders, potentially harm protected fish and tribal interests, and cause certain harm to surrounding communities and farmers. In comparison, plaintiffs fail to establish a clear likelihood of success on the merits or irreparable harm to the spotted frog that would be remedied by the relief they seek. Consequently, the balance of hardships does not tip in favor of plaintiffs, and the requested relief would not serve the public interest.

## CONCLUSION

Accordingly, plaintiffs' motion for preliminary injunction (doc. 20) is DENIED, and plaintiff's motion for request to stay of formal opinion and set a trial date (doc. 63) is DENIED. The parties are directed to contact Paul Bruch, 541-431-4111, to schedule judicial settlement proceedings with Magistrate Judge Coffin.

IT IS SO ORDERED.

Dated this 6th day of April, 2016.

Ann Aiken
United States District Judge

11   - OPINION AND ORDER